Estate of J. H. Howell, Deceased, Katie M. Howell, Executrix, v. Commissioner. Katie M. Howell v. Commissioner.
Estate of Howell v. Commissioner
Docket Nos. 109146, 109147.
United States Tax Court
1943 Tax Ct. Memo LEXIS 352; 1 T.C.M. (CCH) 918; T.C.M. (RIA) 43181; April 21, 1943
*352 Robert Ash, Esq., Munsey Bldg., Washington, D.C., and C. C. Parfet, C.P.A., Waggoner Bldg., Wichita Falls, Tex., for the petitioners. D. D. Smith, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These are consolidated proceedings for the redetermination of deficiencies in income tax for the year 1939 in the amount of $9,710.19 and $9,710.18, respectively. The issue is whether the gain realized from the sale in 1939 of a community interest in an oil and gas lease constituted long-term capital gain, as reported by petitioners, or short-term capital gain, as determined by respondent. Findings of Fact The petitioner Katie M. Howell is an individual, whose address is Electra, Texas. She is the duly appointed and acting executrix of the estate of her deceased husband, J. H. Howell. The income tax returns for the year here involved were filed on the community property basis with the collector of internal revenue for the second district of Texas. On October 6, 1937, one W. P. Ferguson, called party of the first part, and petitioner's decedent, J. H. Howell, called party of the second part, entered into a contract which recited that the party of the *353 first part was the owner of certain land described therein, situated in Wichita County, Texas, and that party of the second part desired to drill a well, or cause a well to be drilled, on such land. The contract then provided further as follows: NOW, THEREFORE, for and in consideration of the payment by said Second Party herein of the sum of $1.00, and other covenants and agreements hereinafter set forth, said First Party agrees to execute and place in escrow in the First National Bank of Wichita Falls, Texas, oil and gas lease covering the above described tract of land, in favor of said second party; and said Second Party hereby agrees that he will, on or before the 21st day of November, 1937, commence the actual drilling of a well on the tract of land above described, said well to be drilled with due diligence to a depth of 4,000 feet, or to a sufficient depth to test what is known as the K-M-A deep sand. In the event production of oil or gas be found in paying quantities at a lesser depth than that herein set forth, it is agreed that second party shall have the privilege of completing such well at such lesser depth, but it is further agreed that in such event, said Second Party *354 shall, within sixty days from the completion of a well at any lesser depth, start the actual drilling of another well to be drilled to the original depth set forth herein; in other words it is the intent hereof that said Second Party will drill a well to test the 4,000 foot sand, or what is known as the K-M-A deep sand, to fulfill the requirements of this contract. The lease mentioned herein is to be for a period of three years, with annual rental of $1.00 per acre; and said lease is to be delivered to said second party at the time said well is actually started. On the same date, October 6, 1937, W. P. Ferguson executed an "Oil and Gas Lease" in favor of J. H. Howell, covering the land described in the above mentioned contract, substantially in accordance with the provisions of the contract. The lease agreement, among other things, obligated the lessee to deliver to the lessor one-eighth part of the oil and gas produced and saved from the leased premises, and contained the following additional provision: As a further consideration, lessee herein agrees that he will commence the actual drilling of a well on or before November 21st, 1937, on the above described acreage; said well *355 to be drilled to a depth sufficient to test the 4,000 foot or K-M-A deep sand, according to contract attached hereto and made a part hereof. On November 19, 1937, the lease and contract were filed for record in the office of the county clerk of Wichita County, Texas. The oil and gas lease was not placed in escrow with the First National Bank of Wichita Falls, Texas, as provided in the contract, but, by mutual consent of the parties, was left with one H. S. Gray, as escrow agent. Gray was instructed to return the lease instrument to Ferguson, the lessor, if no well was actually started on the premises on or before November 21, 1937. Gray was office manager for Ferguson, and also an independent oil producer. On October 5, 1937, it was agreed between the parties that Gray should become the owner of 20 acres out of the Howell lease if and when that lease became valid upon commencement of the drilling of a well within the specified time. On October 26, 1937, J. H. Howell entered into an agreement with Consolidated Oil Company whereby Howell agreed to convey to the company a 3/4 ths interest in the "acreage" covered by his contract with W. P. Ferguson of October 6, 1937, in consideration *356 of the sum of $5,000 cash, and the assumption by Consolidated of all of Howell's obligations under the contract. A well was actually started on the premises covered by the contract and lease on November 16 or 17, 1937, and, on the same day, after Gray had driven to the location and had seen the drilling in actual operation, he delivered the oil and gas lease to Howell, the lessee. By written assignment dated November 19, 1937, Howell conveyed an undivided 3/4 ths interest in the lease to the Consolidated Oil Company. On the same date, Howell and Consolidated Oil Company assigned and conveyed to H. S. Gray all of their interests in the oil and gas lease in so far as it covered a described tract of land, containing 20 acres more or less. Shortly prior to April 1, 1939, negotiations were entered into between Consolidated Oil Company and Buffalo Oil Company with a view to the purchase by Buffalo of the full 7/8 ths working interest in a portion of the land covered by the Ferguson lease. On April 1, 1939, a meeting of the directors of Consolidated was held, at which the following resolution was adopted: Whereas negotiations are in progress for the sale of a portion of the corporation's *357 Ferguson Lease in Wichita County, Texas to the Buffalo Oil Company of Dallas. Texas, for a cash consideration of $700,000.00, which also includes that interest owned by J. H. Howell; Now therefore it is resolved that W. T. Knight, President of the corporation be and is hereby empowered, directed and instructed to continue such negotiations for the sale of Lots 5, 8 and 9 of the W. P. Ferguson Subdivision * * * for a cash consideration of $700,000.00 and to sign and execute all necessary instruments to convey good title to the Oil and Gas lease on said property to said Buffalo Oil Company. Howell was in California on April 1, 1939, and was advised by telephone of the negotiations. He did not agree to the deal at that time, and Consolidated was not authorized by Howell to act in his behalf in that connection. Howell returned to Wichita Falls on or shortly prior to April 10, 1939, in response to telephone and telegraph communications. On the date last mentioned, Howell finally agreed to the proposed terms of sale and an assignment dated April 1, 1939, from Consolidated and Howell to Buffalo was executed. The assignment was also delivered and filed for record on April 10, 1939. The *358 assignment recited that it was to be effective as of April 1, 1939, and the oil runs were payable to Buffalo from that date. There was no written operating contract between Consolidated and Howell covering the property in question, and there was no written contract between Consolidated and Buffalo prior to the assignment of April 10, 1939. The income tax returns filed by decedent and his wife disclosed community profit derived from the sale of their interest in the Ferguson lease computed as follows: Sale of Ferguson A
Leasehold
Equipment
Sales Price
$161,677.67
$13,322.33
Cost
1,531.00
13,322.33
Profit
$160,146.67
None
66 2/3% of Leasehold Profit
$106,764.45
Each spouse reported as taxable income one-half of $106,764.45. Opinion The sole issue for decision in these proceedings is whether the gain derived from the sale in 1939 of a community interest in an oil and gas lease on lands situated in Texas constituted short-term or long-term capital gain within the purview of section 117 of the Internal Revenue Code (as applicable to the calendar year 1939). [1]
*359 In the income tax returns filed by decedent and his wife on the community property basis, the profit derived from the sale in the taxable year of their interest in the Ferguson lease was computed at the total amount of $160,146.67, of which 66 2/3 percent was $106,764.45. Each spouse included in taxable income one-half of the latter amount, on the theory that the amount so reported represented his or her share of long-term capital gain derived from the sale of a capital asset held for more than 18 months but not for more than 24 months. Respondent made no adjustment in the amount of gain derived, but held that the amount reported represented short-term capital gain, taxable to the extent of 100 percent. Thus, the question for determination here is the period or length of time decedent and his wife held their interest in the oil and gas lease known as the Ferguson A. The question is further narrowed to a determination of the date on which such interest was acquired, since the facts found by us above conclusively show that the sale was consummated on April 10, 1939. To hold property is to own it, within the meaning of the statute, and in order to own or hold, it must be acquired. *360 Therefore, the date of acquisition is the date from which to compute for duration of ownership or length of holding. McFeely v. Commissioner, 296 U.S. 102 (16 AFTR 965). The principal point in controversy between the parties here is the date of acquisition of the interest in the oil and gas lease, which was sold on April 10, 1939. Petitioners contend that such interest was acquired on October 6, 1937, which was the date of the lease and of the concurrently executed contract between decedent and Ferguson. Respondent argues that the effective date of the oil and gas lease, and hence the date of acquisition of the interest thereunder, was the date on which the lease instrument was delivered by the escrow agent to decedent upon commencement of the drilling of a well, which was not earlier than November 16, 1937. The question of whether or not title to property has passed to the buyer, and if so when, depends upon the intention of the parties manifested at the time of the transaction or the making of the bargain. C. A. Sporl & Co., 40 B.T.A. 829, affirmed 118 Fed. (2d) 283, (26 AFTR 677); *361 R. A. Shillinglaw, 32 B.T.A. 1235, 1241. And the intention of the parties is "to be gathered from the terms of the contract and such surrounding circumstances as may be legitimately considered as evidencing the intention." Charles C. Hanson, 23 B.T.A. 590, 601. In the case of a written contract, the date on the writing is generally not conclusive; the date of delivery is ordinarily the date when the contract becomes binding, unless an intention is shown to fix another time as the effective date. 17 C.J.S. 7359. Where a written contract is executed and placed in escrow for delivery at a future date on the performance of a condition precedent, and such condition is performed and the instrument delivered, the date of delivery marks the inception of the contract and fixes its effective date. Restatement of the Law of Contracts, Vol. 1, Secs. 101, 103. In the case at bar, the intention of the parties, we think, is very clearly indicated both by the terms of the instrument and by the surrounding circumstances. In the preliminary contract of October 6, 1937, Ferguson, as party of the first part, agreed to execute *362 and place in escrow with the bank an oil and gas lease covering the described lands in favor of petitioner's decedent, J. H. Howell, referred to as party of the second part, who agreed that he would, on or before November 21, 1937, commence the actual drilling of a well on the land. The contract further specifically provided that "said lease is to be delivered to said second party at the time said well is actually started." The lease instrument was executed by Ferguson on October 6, 1937, and by mutual consent of the parties was placed in escrow with H. S. Gray instead of the bank. In our opinion, decedent acquired, under the terms of the preliminary contract, only the right to enter upon the land and commence the actual drilling of a well prior to the stated date. Upon performance of this condition, he became entitled to receive the oil and gas lease from the escrow agent. Petitioner had the privilege, at any time between October 6 and November 21, 1937, of bringing the lease agreement into effect by commencement of the actual drilling of a well, but obviously prior to complying with his agreement in that respect, decedent acquired no rights under the lease. Decedent commenced the *363 actual drilling of the well on November 16 or 17, 1937. Upon the happening of that event, the oil and gas lease became binding, the instrument was delivered to decedent by the escrow agent, and decedent then and there acquired the community interest thereunder. The contract of October 6, 1937, further declared it was the intention that the second party should drill a well to test the 4000 foot or K-M-A deep sand to fulfill the requirements of the contract, and respondent argues that petitioners' interest under the oil and gas lease was not fully acquired until this condition was performed. Obviously the well was not completed to the required depth, if at all, until some time subsequent to commencement of the drilling operations on November 16 or 17, 1937. The record does not disclose the facts on this point, but we think it is immaterial. For present purposes, it is sufficient to hold that the interest of petitioners under the oil and gas lease was acquired not earlier than November 16, 1937, and therefore had been held for less than 18 months at date of sale. The deficiencies determined by respondent are approved. Decisions will be entered for respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - * * * * *
(2) Short-Term Capital Gain. - The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 18 months, if and to the extent such gain is taken into account in computing net income; * * * * *
(4) Long-Term Capital Gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 18 months, * * * (b) Percentage Taken into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income; 100 per centum if the capital asset has been held for not more than 18 months; 66 2/3 per centum if the capital asset has been held for more than 18 months but not for more than 24 months; * * * * *↩